**UNITED STATES BANKRUPTCY COURT**                    **FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 Case |
| Fairfield Sentry Limited, et al. | Case No. 10-13164 (JPM) |
| | (Jointly Administered) |
| Debtors in Foreign Proceedings. | |
| FAIRFIELD SENTRY LTD. (In Liquidation), et al., | |
| Plaintiffs, | Adv. Pro. No. 11-01250 (JPM) |
| v. | |
| UBS EUROPE SE, LUXEMBOURG BRANCH, et al. | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS

*APPEARANCES:*

**GIBSON, DUNN & CRUTCHER LLP**
*Attorneys for Defendant UBS EUROPE SE, LUXEMBOURG BRANCH.*
200 Park Avenue
New York, NY 10166-0193
By:    Marshall R. King
       Gabriel Herrmann

**BROWN RUDNICK LLP**
*Attorneys for the Plaintiffs Joint Liquidators*
Seven Times Square
New York, NY 10036
By:    Jeffrey L. Jonas
       David J. Molton
       Marek P. Krzyzowski
       D Cameron Moxley

**JOHN P. MASTANDO III**
**UNITED STATES BANKRUPTCY JUDGE**

## I.   INTRODUCTION

Pending before the Court is the motion of the Defendant, UBS Europe SE, Luxembourg

Branch, ("Defendant" or "UBS Lux"), to dismiss the Fourth Amended Complaint (the

"Amended Complaint") for lack of personal jurisdiction.  Mot. to Dismiss, ECF[1] No. 128.

The Court held a hearing on the Motion to Dismiss on October 25, 2023 (the "Hearing").  For the

reasons set forth herein, the Court DENIES the Defendant's Motion to Dismiss.

## II.   JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157 and

the Amended Standing Order of Reference dated January 31, 2012 (Preska, C.J.).  This Court

previously concluded that it has subject matter jurisdiction over this and related actions.  *See In*

*re Fairfield Sentry Ltd.*, 2018 WL 3756343 (Bankr. S.D.N.Y. Aug. 6, 2018); *see also* Stip.

Order, ECF No. 98.  Personal jurisdiction is contested by the Defendant and will be discussed

below.

## III.   BACKGROUND

This adversary proceeding was filed on January 13, 2011.  *See* Compl., ECF No. 1.

Kenneth M. Krys and Greig Mitchell (the "Liquidators"), in their capacities as the duly

appointed Liquidators and Foreign Representatives of Fairfield Sentry Limited (In Liquidation)

("Sentry") and Fairfield Sigma Limited (In Liquidation) ("Sigma" and, together with Sentry, the

"Fairfield Funds") filed the Amended Complaint on August 11, 2021.  *See* Am. Compl., ECF

No. 110.  Via the Amended Complaint, the Liquidators seek the imposition of a constructive

---

[1]     Citations to this Court's electronic docket refer to the docket of Adv. Pro. No. 11-01250-jpm unless
otherwise noted.

trust and recovery of approximately \$49.9 million[2] in redemption payments made to UBS Lux by Sentry and Sigma.  *Id.* ¶¶ 1, 8, 156–69.

### A.  The BLMIS Ponzi Scheme

This adversary proceeding arises out of the decades-long effort to recover assets of the Bernard L. Madoff Investment Securities LLC ("BLMIS") Ponzi scheme.[3]  *Id.* ¶ 1.  Defendant allegedly invested into several funds, including Sentry and Sigma, that channeled investments into BLMIS.  *Id.* ¶¶ 2, 5.

Fairfield Sentry was a direct feeder fund in that it was established for the purpose of bringing investors into BLMIS, thereby allowing Madoff's scheme to continue.  *Id.* ¶¶ 5; 35–36; *see also In re Picard*, 917 F.3d 85, 93 (2d Cir. 2019) ("A feeder fund is an entity that pools money from numerous investors and then places it into a 'master fund' on their behalf. A master fund—what Madoff Securities advertised its funds to be—pools investments from multiple feeder funds and then invests the money.").  Fairfield Sigma, in contrast, was an indirect feeder fund, established to facilitate investment in BLMIS through Fairfield Sentry for foreign currency. Am. Compl. ¶ 36.  BLMIS used investments from feeder funds, like the Fairfield Funds, to satisfy redemption requests from other investors in the scheme.  *Id.* ¶¶ 5–6.  Without new investors, BLMIS would have been unable to make payments to those who chose to withdraw their investments, and the scheme would have fallen apart.  *Id.* ¶¶ 6, 13, 36, 39–40.

The Amended Complaint alleges that investors received payments on account of their shares in the Fairfield Funds based on a highly-inflated Net Asset Value ("NAV").  *Id.* ¶ 7.

---

[2]    Approximately half of the redemption payments were made in Euros.  Am. Compl. ¶¶ 43-45, ECF No. 110; *id.* Exs. A–B.  The Amended Complaint uses the exchange date as of the date of the redemption to calculate the amount in dollars.  *Id.* Exs. A–B; *see also* Opp'n at 1 n.2, ECF No. 157.

[3]    The Court will not recount all details concerning the Ponzi scheme perpetrated by Madoff.  Details of that scheme have been recounted by many courts.  *See, e.g., In re Madoff*, 598 B.R. 102, 106 (S.D.N.Y. 2019), *aff'd* 818 F. App'x 48 (2d Cir. 2020).

Defendant is allegedly "one such investor." *Id.* To calculate the NAV, administrators used statements provided by BLMIS that showed "securities and investments, or interests or rights in securities and investments, held by BLMIS for the account of Sentry." *Id.* ¶ 38. In fact, no securities were ever bought or sold by BLMIS for Sentry, and none of the transactions on the statements ever occurred. *Id.* ¶ 39. The money sent to BLMIS by the Fairfield Funds for purchase of securities was instead used by Bernard Madoff to pay other investors or was "misappropriated by Madoff for other unauthorized uses." *Id.* The NAVs were miscalculated, and redemption payments were made in excess of the true value of the shares. *Id.* ¶ 42. The Fairfield Funds were either insolvent when the redemption payments were made or were made insolvent by those payments. *Id.* ¶ 41.

Defendant UBS Lux was a corporate entity organized under the laws of Luxembourg with a registered address in Luxembourg. *Id.* ¶ 32. UBS Lux subscribed for the purchase of shares with Sentry and Sigma, eventually receiving approximately $49,963,561.26 in redemption payments from the Funds between August 13, 2004, and November 21, 2008. *Id.* ¶¶ 8, 43. Based on "UBS Lux's directions and instructions, UBS Lux received $24,974,078.05 in Redemption Payments at its bank account with UBS AG in Stamford, Connecticut." *Id.* ¶ 44.[4]

Bernard Madoff was arrested in violation of federal securities laws on December 11, 2008. *Id.* ¶ 143. The United States Attorney brought criminal charges against him, alleging that Madoff ran a Ponzi scheme. *Id.* On December 11, 2008, the Securities Exchange Commission filed an action in the Southern District of New York to halt the continued offerings of securities. *Id.* ¶ 144. In March 2009, Madoff pleaded guilty to criminal charges against him and confessed

---

[4]    Exhibits to the Amended Complaint show the dates and amounts of each redemption payment received by Defendant from Sentry and Sigma. *Id.* Exs. A, B.

to operating a Ponzi scheme and fabricating statements and trade confirmations. *Id.* ¶¶ 145–46.

Madoff was sentenced to 150 years in federal prison and died in April 2021. *Id.* ¶ 147.

The Amended Complaint alleges that UBS Lux "had knowledge of the Madoff fraud, and

therefore knowledge that the Net Asset Value was inflated" when the redemption payments were

made. *Id.* ¶ 160. The Amended Complaint further asserts that between 2001 and 2008,

Defendant "ascertained multiple indicia of fraud through due diligence on BLMIS, leading it to

believe that BLMIS was a fraud, and, therefore, that the Net Asset Value could not be accurate."

*Id.* ¶ 160. These indicia included Madoff's dual roles as broker and depository, the impossibility

of BLMIS's returns as reported, and Madoff's lack of transparency. *Id.* ¶ 161. The Amended

Complaint alleges that UBS Lux had been "willfully blind to, or recklessly disregarded the fact

that Madoff was operating a fraud" in the face of these red flags. *Id.* ¶ 164.

### B. <u>The Prior Litigation and Procedural History</u>

The Fairfield Funds were put into liquidation in the British Virgin Islands ("BVI") in

2009. *Id.* ¶ 149. The BVI issued orders appointing the foreign representatives, Kenneth Krys

and Greig Mitchell, as liquidators of the Fairfield Funds. *Id.* ¶ 14. Pursuant to the appointment

order of the BVI court,[5] the "Foreign Representatives are responsible for all aspects of the

Funds' business, including protecting, realizing, and distributing assets for the Funds' estates."

*Id.* ¶ 153. The Liquidators commenced actions in the BVI against a number of investors who

had redeemed shares of the Fairfield Funds before the collapse of the scheme. Mem. L. at 6,

ECF No. 129; *Fairfield Sentry Ltd. v. Citibank, N.A. London*, 630 F. Supp. 3d 463, 475

(S.D.N.Y. 2022); *see also In re Fairfield Sentry Ltd. v. Theodoor GGC Amsterdam (In re*

*Fairfield Sentry Ltd.)*, 596 B.R. 275, 284 (Bankr. S.D.N.Y. 2018) ("Fairfield II").

---

[5]    The order was issued by the "Commercial Division of the Eastern Caribbean High Court of Justice." *See*
Am. Compl. at 1.

The Liquidators filed petitions in this Court in June 2010 under Chapter 15 of the

Bankruptcy Code, seeking recognition of the BVI proceedings as foreign main proceedings.

Am. Compl. ¶ 28.  This Court granted that recognition on July 22, 2010.  *Id.*  All cases filed by

the Plaintiffs were administratively consolidated before this Court in November 2010.  *See*

Consolidation Order, Adv. Pro. No. 10-03496, ECF No. 25; *see also* Am. Order Regarding

Consolidation of Certain U.S. Redeemer Actions, ECF No. 138.

The Plaintiffs asserted multiple causes of action in those consolidated adversary

proceedings including, *inter alia*, mistaken payment and constructive trust.[6]  Compl. ¶¶ 60–154,

ECF No. 1;  *see also* 630 F. Supp. 3d at 479.  In October 2011, this Court stayed the U.S.

proceedings pending resolution of the BVI proceedings.  *See* Am. Order Staying Redeemer

Actions, Adv. Pro. No. 10-03496, ECF No. 418.; *In re Fairfield Sentry Ltd.*, 2018 WL 3756343,

at *3 (Bankr. S.D.N.Y. Aug. 6, 2018).

In April 2014, the Privy Council affirmed dismissal of the Plaintiffs' BVI law claims for

restitution based on mistaken payment.  *Fairfield Sentry Ltd. (In Liquidation ) v. Migani*, [2014]

UKPC 9 ("*Migani* ").[7]  The Privy Council held that the Plaintiffs' claims for restitution in the

BVI to recover redemption payments arising out of transactions governed by the Funds' Articles

of Association are governed by BVI law.  *Id.* ¶ 17.  The Plaintiffs' claims to recover redemption

payments thus depended on whether it was bound to make those payments under the "true NAV

per share, ascertained in the light of information which subsequently became available about

Madoff's frauds, or . . . the NAV per share which was determined by the Directors at the time of

---

[6]      Other causes of action included unjust enrichment, money had and received, unfair preferences under BVI's Insolvent Act § 245, and undervalue transactions under the Insolvent Act § 246.

[7]      *Migani* is available at https://www.jcpc.uk/cases/docs/jcpc-2012-0061-judgment.pdf and, without numbered paragraphs, on the Westlaw database at *Fairfield Sentry Ltd (In Liquidation) v Migani*, 2014 WL 1219748.

redemption." *Id.* ¶ 19.  The Privy Council concluded that the NAV had to be definitively determined at the time of the subscription or redemption.  *Id.* ¶ 21.  The redemption payments made under the NAV were thus not subject to restitution and the payee was not unjustly enriched by receiving funds, even if the amount was mistaken.  *Id.* ¶¶ 18–19.

After *Migani* was issued, the Plaintiffs allegedly obtained evidence of bad faith of Citco, the Fairfield Fund's administrator, when it issued redemption certificates.  *See In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2018 WL 3756343, at *5–6 (Bankr. S.D.N.Y. Aug. 6, 2018). Plaintiffs moved to amend the complaint, seeking to add allegations that Citco lacked good faith when it issued certificates for redemptions and was aware that the NAV was inflated at the time. *See id.* at *6.  The Plaintiffs argued that the certificates would not be binding under the Funds' Articles if they were not issued in good faith.  *Id.*

In December 2018, this Court found that the Plaintiffs could allege bad faith on behalf of Citco in the U.S. proceedings and could seek recovery of the redemption payments only "where a Defendant knew the NAV was inflated at the time of redemption."  *Fairfield II*, 596 B.R. at 295.  Of the common law claims, the Court allowed only the Plaintiffs' claims for constructive trust against the so-called 'Knowledge Defendants' to proceed.  *Id.* at 301 ("The suggestion that the subsequent disclosure of facts indicating that the valuation was made in bad faith vitiates the contract and requires restitution lacks support. The only exception concerns the Knowledge Defendants that received redemption payments with the knowledge that the NAV was wrong. In those circumstances, the Liquidators may seek to impose a constructive trust.").  In December 2020, this Court ruled that § 546(e) bars Plaintiffs' BVI avoidance claims to recover unfair preferences and undervalue transactions.  *In re Fairfield Sentry Ltd.*, 2020 WL 7345988, at *1 (Dec. 14, 2020) ("*Fairfield III*").

Following these decisions, only the constructive trust claims survived. *Id.*; *In re Fairfield Sentry Ltd.*, No. 10-13164 (SMB), 2021 WL 771677, at *1 (Bankr. S.D.N.Y. Feb. 23, 2021) ("*Fairfield IV*"), *aff'd*, 630 F. Supp. 3d 463. The Liquidators filed a further motion to amend the complaints against the Knowledge Defendants. Mot. to Amend, ECF No. 100; Mot. to Amend, Adv. Pro. No. 10-03496, ECF No. 3737. On August 5, 2021, this Court granted the motion to amend the complaint and lifted the stay of the redeemer actions. Order Granting Mot. to Amend, ECF No. 109; Order Lifting Stay of Redeemer Actions, ECF No. 108.

## C. <u>The Pending Motion</u>

The Amended Complaint seeks the imposition of a constructive trust on the redemption payments received from the Fairfield Funds. Am. Compl. ¶ 169, ECF No. 110. The Amended Complaint alleges that UBS Lux had knowledge of the fraud at BLMIS and therefore knowledge that the NAV was inflated. *Id.* ¶ 160. "By reason of their receipt of some or all of the Redemption Payments, Defendants have been unjustly enriched to the detriment of Sentry and Sigma and other shareholders and creditors of Sentry and Sigma." *Id.* ¶ 166.

Under BVI law, "lack of good faith, *i.e.* bad faith, includes wrongdoing by one who acts recklessly as well as one who acts with actual knowledge that he is acting wrongfully or willfully blinds himself to that fact." *Id.* ¶ 156 (citing 596 B.R. at 293). As this Court previously found:

> To establish a constructive trust claim under English law, which would apply in the BVI, 'the plaintiff must show, first, a disposal of his assets in breach of fiduciary duty; second, the beneficial receipt by the defendant of assets which are traceable as representing the assets of the plaintiff; and third, knowledge on the part of the defendant that the assets he received are traceable to a breach of fiduciary duty.'

*In re Fairfield Sentry Ltd.*, 2021 WL 771677 (Bankr. S.D.N.Y. Feb. 23, 2021) (quoting *El Ajou v. Dollar Land Holdings Ltd.* [1994] 2 All E.R. 685, 700).

The Amended Complaint alleges that UBS Lux purposefully availed itself of the laws of the United States and the State of New York by "investing money with the Funds, knowing and intending that the Funds would invest substantially all of that money in New York-based BLMIS, and maintaining bank accounts in the United States at UBS AG in Connecticut, and in fact receiving Redemption Payments in those United States-based accounts."  Am. Compl. ¶ 19, ECF No. 110.  The Amended Complaint further alleges that Defendant "selected U.S. dollars as the currency in which to invest and execute their transactions in Sentry, designated United States-based bank accounts to receive their Redemption Payments from the Funds, and actively directed Redemption Payments at issue in this action into those United States bank accounts." *Id.*

The parties engaged in personal jurisdiction discovery between September 2021 and August 2022.  *See* Scheduling Order at 8, ECF No. 118 ("The parties are to proceed with discovery according to the Federal Rules of Civil Procedure."); Second Am. Scheduling Order at 2, ECF No. 152 ("The parties shall complete all jurisdictional document productions by <u>August 15, 2022</u>.") (emphasis in original).  Fact discovery is ongoing in this case.  Second Am. Scheduling Order at 2; *see also* Fifth Am. Scheduling Order, ECF No. 184.

Defendant has moved to dismiss the Amended Complaint for lack of personal jurisdiction, arguing that the Amended Complaint has not sufficiently alleged minimum contacts with the forum to establish personal jurisdiction over Defendant and that exercising personal jurisdiction would be unreasonable.  *See* Mem. L. at 3–6, ECF No. 129.

The Liquidators filed an opposition to the Motion and submitted declarations of Joshua Margolin and Sara Joyce in support of their opposition.  Opp'n, ECF No. 157; Declaration of Joshua S. Margolin in Support of Liquidators' Opposition ("Margolin Decl."), ECF No. 158;

Declaration of Sara K. Joyce ("Joyce Decl."), ECF No. 159.  The Liquidators argue that

exercising jurisdiction over Defendant would be reasonable and that Defendant's contacts with

the United States in knowingly and intentionally investing in the Fairfield Funds, using U.S.

correspondent accounts to invest in and receive payments from Sentry, and other business

activities support personal jurisdiction.  Opp'n at 2–4, ECF No. 157.[8]  UBS Lux filed a reply

memorandum on March 20, 2023.  Reply, ECF No. 160.  This Court reviewed the above filings

and held a hearing on the Motion on October 25, 2023.  *See* Hr'g Tr., ECF No. 179.

## IV.    DISCUSSION

### A.    The Law of Personal Jurisdiction

In order to subject a defendant to personal jurisdiction in the United States, due process

requires that the defendant have sufficient minimum contacts with the forum in which the

defendant is sued "'such that the maintenance of the suit does not offend traditional notions of

fair play and substantial justice.'"  *Picard v. Bureau of Labor Ins.* (*In re BLMIS*), 480 B.R. 501,

516 (Bankr. S.D.N.Y. 2012) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"In adversary proceedings, courts must determine whether the defendant has minimum contacts

with the United States, rather than with the forum state."  *Picard v. Fairfield Greenwich Grp. (In

re Fairfield Sentry Ltd.)*, 627 B.R. 546, 565 n.13 (Bankr. S.D.N.Y. 2021) (citing *In re Lehman

Bros. Holdings Inc.*, 535 B.R. 608, 619 (Bankr. S.D.N.Y. 2015)).  "When jurisdiction is satisfied

---

[8]      Pursuant to various orders of this Court, portions of certain filings and supporting documents were filed
under seal.  The Court held a status conference on December 18, 2023, during which the Court informed the parties
that certain documents previously filed under seal might be cited, quoted, or otherwise referenced by the Court in
this opinion.  *See* Notice of Hr'g, ECF No. 182.  The Court gave the parties the opportunity to withdraw from the
record any previously sealed materials that the party did not want to be cited, quoted, or otherwise referenced in the
opinion.  The parties requested that the Court not refer to any bank account numbers in full or name any individual
UBS Lux employee (which the Court does not do in this opinion).

through Bankruptcy Rule 7004,[9] a bankruptcy court need not address its state's long-arm

statute." *Id.* n.12; *see also Owens-Illinois, Inc. v. Rapid Am. Corp. (In re Celotex Corp.)*, 124

F.3d 619, 630 (4th Cir. 1997).

An analysis of minimum contacts "focuses on the relationship among the defendant, the

forum, and the litigation," a relationship that "must arise out of contacts that the defendant

himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quotations

omitted). There are three conditions necessary for the Court to exercise specific jurisdiction[10]

over the non-resident defendant:

> First, the defendant must have purposefully availed itself of the privilege of
> conducting activities within the forum State or have purposefully directed its
> conduct into the forum State. Second, the plaintiff's claim must arise out of or
> relate to the defendant's forum conduct. Finally, the exercise of jurisdiction must
> be reasonable under the circumstances.

*U.S. Bank Nat'l Ass'n v. Bank of Am. N.A.*, 916 F.3d 143, 150 (2d Cir. 2019) (internal quotation

marks and citations omitted).

To survive a motion to dismiss for lack of personal jurisdiction pursuant to Federal Rule

of Civil Procedure Rule 12(b)(2), the Plaintiff "must make a prima facie showing that

jurisdiction exists." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342 (2d Cir. 2018) (quoting

*Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34–35 (2d Cir. 2010)). A trial court has

---

[9]    "The summons and complaint and all other process except a subpoena may be served anywhere in the
United States." Fed. R. Bankr. P. 7004(d). A bankruptcy court may exercise personal jurisdiction over a defendant
served under Rule 7004(d) "[i]f the exercise of jurisdiction is consistent with the Constitution and the laws of the
United States." Fed. R. Bankr. P. 7004(f).

[10]    Courts recognize "two types of personal jurisdiction: general and specific jurisdiction. A state court may
exercise general jurisdiction only when a defendant is 'essentially at home' in the State." *Ford Motor Co. v.
Montana Eighth Jud. Dist. Ct.*, 592 U.S. -----, 141 S. Ct. 1017, 1019, 209 L. Ed. 2d 225 (2021) (quoting *Goodyear
Dunlop Tires Operations, S. A v. Brown*, 564 U.S 915, 919, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)). The
Plaintiffs do not allege that the Court has general jurisdiction over Defendant. *See* Mem. L. at 10, ECF No. 129
("Plaintiffs do not—and could not—allege that the Court has general jurisdiction over UBS Lux, a bank that is not
'at home' in the United States, and so Plaintiffs must plead facts supporting the exercise of specific jurisdiction over
UBS Lux."); Opp'n at 2, ECF No. 157 (arguing that the Court's specific jurisdiction is founded on Defendant's
contacts with the forum that relate to the claims at issue).

considerable procedural leeway when addressing a pretrial dismissal motion under Rule 12(b)(2).

*Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013).

A showing sufficient to defeat a defendant's challenge to personal jurisdiction "varies

depending on the procedural posture of the litigation." *Id.* (quoting *Ball v. Metallurgie Hoboken-*

*Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Following discovery, "the plaintiff's prima

facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of

facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant."

*Ball*, 902 F.2d at 197. "In response to a post-jurisdictional discovery Rule 12(b)(2) motion, 'the

plaintiff need persuade the court only that its factual allegations constitute a prima facie showing

of jurisdiction.'" *Averbach v. Cairo Amman Bank*, No. 19-CV-0004-GHW-KHP, 2023 WL

5016884, at *4 (S.D.N.Y. June 30, 2023) (quoting *Dorchester Fin. Sec.*, 722 F.3d at 85). "Now

that jurisdictional discovery is complete, Plaintiffs' burden is different, but it is not heavy." 2023

WL 5016884, at *6 (citing 722 F.3d at 85). "Plaintiffs need only show that their prima facie

showing of jurisdiction is factually supported." *Id.* at *6. When considering a motion to dismiss

before or after jurisdictional discovery has taken place, "the court must 'construe the pleadings

and affidavits in the light most favorable to plaintiffs,' and resolve all doubts, including factual

disputes, in the plaintiff's favor." *Id.* at *4 (quoting *Ball*, 902 F.2d at 197).

**B.  Analysis of Purposeful Availment**

"[M]inimum contacts necessary to support [specific] jurisdiction exist where the

defendant purposefully availed itself of the privilege of doing business in the forum and could

foresee being haled into court there." *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68,

82 (2d Cir. 2018) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161,

170 (2d Cir. 2013)). For specific personal jurisdiction, "'[c]ourts typically require that the

plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit,' and the plaintiff's claim must in some way 'arise from the defendant's purposeful contacts with the forum.'" *Charles Schwab Corp.*, 883 F.3d at 84 (quoting *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341, 343 (2d Cir. 2016)). "Although a defendant's contacts with the forum state may be 'intertwined with [its] transactions or interactions with the plaintiff or other parties . . . [,] a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction.'" *U.S. Bank Nat'l Ass'n*, 916 F.3d at 150 (quoting *Walden*, 571 U.S. at 134) (alteration in original). "It is insufficient to rely on a defendant's random, fortuitous, or attenuated contacts or on the unilateral activity of a plaintiff with the forum to establish specific jurisdiction." *Id.*

Defendant asserts that the "Plaintiffs have previously agreed that their claims are purely foreign." Mem. L. at 2, ECF No 129. Defendant refers to the Plaintiffs' arguments in 2021 before the District Court in which Plaintiffs claimed that the "redemption transfers at issue here were purely foreign" and that "every relevant component of the transactions at issue here occurred outside the territorial jurisdiction of the United States." *Id.*; *see also* Pls.-Appellants' Opening Br. for Second Round Appeal at 24, *Fairfield Sentry Ltd. v. Citibank NA London*, No. 19-cv-3911 (S.D.N.Y. July 21, 2021), ECF No. 440 (the "Opening Brief"). The Plaintiffs' Opening Brief concerned the extraterritorial application of the § 546(e)[11] safe harbor. *See* Opening Brief at 24 (arguing that the "Bankruptcy Court erred in holding that Section 546(e)'s safe harbor could apply extraterritorially to shield from avoidance settled securities transactions that occurred exclusively outside the United States.").

---

[11]     Section 546(e) of the Bankruptcy Code prohibits a trustee from avoiding a transfer that is a margin payment or settlement payment "made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, or that is a transfer made by or to (or for the benefit of) a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency, in connection with a securities contract. . . ." 11 U.S.C. § 546(e).

As another bankruptcy court in this district has stated, the "tests for personal jurisdiction and extraterritoriality are not the same." *Spizz v. Goldfarb Seligman & Co. (In re Ampal-Am. Israel Corp.)*, 562 B.R. 601, 613 n.14 (Bankr. S.D.N.Y. 2017). In *Spizz*, the bankruptcy court was able to simultaneously find that the "[t]ransfer was not domestic, and hence, cannot be avoided" under § 547, while also clarifying that by "attend[ing] meetings in New York around the time of, and apparently in conjunction with, the commencement of the chapter 11 case," a defendant may be "subject to specific personal jurisdiction." *Id.* at 613–14.

By arguing in the District Court that the redemption transfers were foreign for purposes of extraterritoriality, Plaintiffs did not preclude arguing that there were contacts with the forum for purposes of personal jurisdiction. To determine whether a transaction is foreign or domestic for analyzing extraterritoriality issues for federal statutes, courts look at whether the "conduct relevant to the statute's focus occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 326, 136 S. Ct. 2090, 2094, 195 L. Ed. 2d 476 (2016). To determine whether personal jurisdiction is appropriate, however, courts analyze a defendant's contacts with the forum "under a totality of the circumstances test." *Licci*, 732 F.3d at 170 (citing *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 242 (2d Cir. 2007)).

### 1. **Defendant's Use of Correspondent Accounts**

The Plaintiffs point to the Defendant's choice to use correspondent accounts at its U.S. affiliate, UBS AG, Stamford Branch, ("UBS Stamford") as sufficient to establish minimum contacts with the United States. Opp'n at 7, 11, ECF No. 157. "Correspondent accounts are accounts in domestic banks held in the name of foreign financial institutions" that are used "to effect dollar transactions." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 56 n.3 (2d Cir. 2012) (quoting *Sigmoil Res., N.V. v. Pan Ocean Oil Corp. (Nigeria)*, 234 A.D.2d

103, 104, 650 N.Y.S.2d 726, 727 (1st Dep't 1996)).  Plaintiffs allege that Defendant "deliberately

and repeatedly utilized U.S. bank accounts" to effectuate the subscription and redemption

payments that form the harms for which Plaintiffs seek redress.[12]  Opp'n at 2, ECF No. 157; *id.*

at 7 ("On at least 99 occasions over five years, UBS Lux intentionally utilized its account at UBS

Stamford to send its subscription payments to, and to receive its redemption payments from,

Sentry.").

Defendant argues that its alleged receipt of payments at a U.S.-based correspondent bank

account is insufficient to establish personal jurisdiction and that "mere use of a correspondent

bank account at a U.S. financial institution to facilitate the receipt of dollar-denominated

payments does not subject UBS Lux to personal jurisdiction in the United States . . . ."  Mem. L.

at 4, ECF No. 129  (citing *Hau Yin To v. HSBC Holdings PLC*, No. 15CV3590-LTS-SN, 2017

WL 816136 (S.D.N.Y. Mar. 1, 2017), *aff'd*, 700 F. App'x 66 (2d Cir. 2017)).  *Hau Yin To* found

no basis for personal jurisdiction over a foreign defendant where the "wiring of funds through

New York . . . was passive, rather than 'integral' to the alleged Ponzi scheme" and where the

"passage of money through the U.S. bank accounts w[as] merely incidental and not specifically

directed by any of the HSBC entities to facilitate the Ponzi scheme."  *To*, 2017 WL 816136, at

*7 n.6.  These facts were contrasted with those presented in *Al Rushaid v. Pictet & Cie*, 28

N.Y.3d 316, 68 N.E.3d 1 (2016), where the New York Court of Appeals "held that the foreign

bank was subject to personal jurisdiction in New York because the 'defendants [including the

foreign bank] orchestrated the money laundering and . . . the New York account was integral to

---

[12]    The use of correspondent accounts concerns only the transfers that originated from Sentry.  Opp'n at 20,
ECF No. 157 ("UBS Lux did not designate a U.S. correspondent account for its redemption of Sigma shares . . . .").
The investments in Sigma were in Euros, not U.S. dollars, and therefore did not require the use of U.S.
correspondent accounts.  Am. Compl. ¶ 35; *Id.* Ex. B (Listing alleged redemption payments received by Defendant
from Sigma); *see also* Mem. L. at 1 n.2, ECF No. 129 ("Sigma is alleged to have made redemption payments
denominated in Euros to accounts in Frankfurt, Germany."); *see also* Opp'n at 20 n.16 ("While UBS Lux did not
designate a U.S. correspondent account for its redemption of Sigma shares, it is still subject to jurisdiction with
respect to those transactions . . . .").

the scheme.'" *Id.* (citing *Rushaid*, 28 N.Y.3d at 328, 68 N.Y.3d at 11) (alterations in original). Furthermore, in *Rushaid*, "there was a scheme in which the foreign bank specifically contemplated wiring tainted funds into a New York account from which corrupt payments were then further distributed to individuals with accounts at the foreign bank." *To*, 2017 WL 816136, at *7 n.6.

Here, the Plaintiffs have shown that the Defendant was able to use a foreign-based or a U.S.-based correspondent bank account for its redemption requests and chose the latter. *See* Joyce Decl. at 5–9, ECF No. 159; *id.* at 11 ("[S]ubscription agreements for Fairfield Sentry . . . do not contain any requirement that the subscriber utilize a U.S. account to send subscription payments or receive redemption payments."); *id.* at 12 ("Neither the fact that Fairfield Sentry was a U.S.-dollar denominated fund, nor the fact that the subscription agreement instructed subscribers to wire their subscription payments to Sentry's U.S. account, nor the fact that Sentry made redemption payments from its own U.S. account would have prevented a subscriber from making subscription payments from and directing redemption payments to a U.S. dollar account located outside the U.S."); *id.* ("The U.S. dollar was in wide circulation outside the U.S. during the Relevant Period, and many other payment options were widely available and easily accessible during the Relevant Period. To the extent that a foreign subscriber chose a U.S.-based correspondent account to effectuate their payments, it was generally for reasons of its own convenience or financial benefit.").

This was no passive endeavor; the Plaintiffs allege that UBS Lux's "redemption payments were wired to its U.S. account *only because* UBS Lux chose that account and actively instructed Sentry to send payments there." Opp'n. at 23, ECF No. 157 (emphasis in original). It did so repeatedly, using the correspondent accounts to send at least thirty-four subscription

payments totaling approximately $11,160,996 to Sentry, and to receive sixty-five redemption

payments totaling approximately $24,974,078 from Sentry at UBS Lux's  account at UBS

Stamford in Connecticut.  Opp'n 1–3, 25; Am. Compl. ¶¶ 43–45, ECF No. 110; *id.* Ex. A;

Margolin Decl. Exs. 23–35, ECF No. 158.  UBS Lux accomplished the conduct at the heart of

the Liquidators' claims through its use of the correspondent accounts.  The Second Circuit has

found the selection and repeated use of in-forum correspondent accounts to perpetrate the alleged

violations to support a finding of sufficient minimum contacts.  *Licci ex rel. Licci v. Lebanese*

*Canadian Bank, SAL*, 732 F.3d 161, 171 (2d Cir. 2013).

Defendant further argues that the Court should dismiss the Complaint due to the

perceived disastrous results of finding jurisdiction under these circumstances when Defendant

asserts states that "[w]ere the incidental use of U.S.-based accounts sufficient to confer personal

jurisdiction over foreign entities, New York would become a forum for any foreign commercial

dispute, contrary to federal and state policy, merely because global transactions are frequently

cleared in U.S. dollars."  Mem. L. at 20, ECF No. 129.

UBS Lux's concern for the alleged effects of finding jurisdiction is unpersuasive.  The

Second Circuit has stated that "[s]imply transacting in U.S. dollars does not make a defendant

bank amenable to suit in New York."  *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 643 (2d Cir.

2023); *see also In re Lifetrade Litig.*, No. 17-CV-2987(JPO), 2021 WL 1178087, at *3 (S.D.N.Y.

Mar. 29, 2021) (finding that by simply carrying out a transaction in New York "the connection

[between the transaction and the claim] would not rise above the 'merely coincidental,' . . . as

most large businesses move money through New York at one point or another.").  Furthermore,

courts in this district have "routinely held that merely maintaining a New York correspondent

bank account is insufficient to subject a foreign bank to personal jurisdiction."  *Tamam v.*

*Fransabank* Sal, 677 F. Supp. 2d 720, 727 (S.D.N.Y. 2010); *Licci*, 732 F.3d at 171 ("[W]e by no means suggest that a foreign defendant's 'mere maintenance' of a correspondent account in the United States is sufficient to support the constitutional exercise of personal jurisdiction over the account-holder in connection with any controversy."); *see also Leema Enterprises, Inc. v. Willi*, 575 F. Supp. 1533, 1537 (S.D.N.Y. 1983) (describing the "mere maintenance" of a correspondent account to mean that the accounts were "unrelated to the fraud alleged" and that there were no other allegations of "affirmative conduct allegedly required of the [defendant] in connection with the contract . . . .").

However, a defendant's selection and repeated use of a New York correspondent account, where the specific selection was at the defendant's direction, can show that the contacts with "New York [are] not random or fortuitous but sufficiently purposeful to satisfy New York's long-arm statute." *Spetner*, 70 F.4th at 640–42. This is true even though "New York remains the 'national and international center for wholesale wire transfers' . . . ." *Id.* at 642 (quoting *Banque Worms v. BankAmerica Int'l*, 77 N.Y.2d 362, 370, 568 N.Y.S.2d 541, 570 N.E.2d 189 (1991)). Where a foreign bank alternative may be less attractive to a defendant, that is only further support for the proposition that the purpose of holding the New York correspondent account is "to gain convenient access to New York's financial system." 70 F.4th at 642.

## 2. **Defendant's Business Contacts with the Forum**

The Liquidators assert that Defendant "intentionally invested in BLMIS feeder funds Sentry and Sigma knowing that the Funds were designed to subsequently invest that money in New York-based BLMIS. UBS Lux is subject to this Court's jurisdiction with respect to its Sentry and Sigma redemptions as a result of that conduct." Opp'n at 12, ECF No. 157. Defendant describes the allegations that it knew the subscription payments into the Fairfield

Funds would be invested in BLMIS in New York as the unilateral activity of a third-party

foreign administrator of the Funds, which Defendant argues is not appropriate to consider under

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984). *See* Mem. L. at

11, ECF No. 129.

In *Helicopteros*, the Supreme Court found that "mere purchases, even if occurring at

regular intervals, are not enough to warrant a State's assertion of in personam jurisdiction over a

nonresident corporation in a cause of action not related to those purchase transactions."

*Helicopteros*, 466 U.S. at 418. The Supreme Court found that "one trip" to the forum "for the

purpose of negotiating the transportation-services contract . . . cannot be described or regarded as

a contact of a 'continuous and systematic' nature . . . ." *Id.* at 416. The Liquidators, however,

have described more substantial contacts here.

First, the Liquidators point to the offering documents given to UBS Lux before and

during the time it invested to demonstrate that UBS Lux intended to channel funds into BLMIS.

Opp'n at 14, ECF No. 157. In August 2018, this Court held that it does not have personal

jurisdiction over certain defendants due to subscription agreements that provided for consent to

jurisdiction in New York for claims "with respect to [the Subscription] Agreement and the

Fund." *In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *11 (Bankr. S.D.N.Y. Aug. 6, 2018).

The Liquidators here rely on the subscription agreements and private placement memoranda not

to show consent, but to show that when Defendant invested in Fairfield Sentry, it did so knowing

that it would avail itself of the benefits and protections of New York. Opp'n at 28–29. The

subscription agreements, in this way, support the Plaintiffs' showing of contacts with the forum.

In addition, Defendant received memoranda at the time it subscribed into the Fairfield

Funds that explained the objective of Sentry was to "achieve capital appreciation of its assets

principally through the utilization of . . . [the] 'split strike conversion.'"  Margolin Decl., Ex. 7 at
-5871, ECF No. 158  (2006 Sentry Private Placement Memorandum).  The split strike conversion
strategy was "implemented by Bernard L. Madoff Investment Securities LLC."  *Id.*; *see also id.*,
Ex. 8 at -3034, -3046 (2003 Sigma Private Placement Memorandum).  Sentry would allocate no
more than 5% in aggregate of its net asset value in investments other than BLMIS's split strike
conversion strategy.  *Id.* Ex. 7 at -5872.  Sentry's information memorandum identified BLMIS as
the "sub-custodian of the Fund."  *Id.* Ex. 7 at -5878.  These documents show that Defendant was
aware at the time that its investments in Fairfield Sentry was effectively an investment in BLMIS
in New York.

Second, evidence shows that employees of UBS Lux were in communication via email
with the manager of the Fairfield Funds in New York, the Fairfield Greenwich Group, to discuss
investments with the Funds.  *Id.* Exs. 16–17 (emails from employees with @ubs.com address and
employees of Fairfield Greenwich Group in New York discussing payment for Sigma
subscription); *see also id.* Ex. 14 at -3669 (email from Fairfield Greenwich Group employee
thanking UBS Lux for its "support in increasing the subscription amounts on behalf of your
upcoming orders . . . .").  These contacts demonstrate more than mere purchases or a one-time
visit to the forum.  The Liquidators have demonstrated facts showing continuous and systemic
contacts with the forum.

### 3. <u>Whether the Defendant's Contacts are Otherwise Appropriate to Support the Court's Exercise of Personal Jurisdiction</u>

The Court will address UBS Lux's remaining arguments that the Defendant's alleged
contacts are not jurisdictionally relevant under Supreme Court precedent.  Mem. L at 13–18,
ECF No. 129.  Defendant argues that the Plaintiffs' allegations amounting to "mere knowledge
that the Funds would take moneys they raised in the BVI and invest them with BLMIS in New

York is insufficient as a matter of law to support jurisdiction" under *Walden v. Fiore*, 571 U.S. 277 (2014).  Mem. L. at 13.

In *Walden*, the Supreme Court found that a defendant "formed no jurisdictionally relevant contacts" with the forum state of Nevada as he "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada."  *Walden*, 571 U.S. at 289. The Supreme Court further stated that it is impermissible to allow the "plaintiff's contacts with the defendant and forum to drive the jurisdictional analysis."  *Id.*  As the Supreme Court explained, the "plaintiff cannot be the only link between the defendant and the forum," and "the defendant's conduct . . . must form the necessary connection with the forum State."  *Id.* at 285. Nevertheless, personal jurisdiction may be found even where a "defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties."  *Id.* at 286.

The Liquidators' allegations and supporting evidence of intentional investment into BLMIS in New York and communications with the Fairfield Greenwich Group, as described above, demonstrate that UBS Lux took affirmative actions on its own apart from the conduct of the Plaintiffs.  *See, e.g.,* Am. Compl. ¶¶ 11, 19, ECF No. 110; Opp'n at 17, ECF No. 157.  The Liquidators have shown that the Defendant knew with certainty and intended that, by investing in the Funds, Defendant's money would enter into U.S.-based BLMIS.  Am. Compl. ¶¶ 43–111. This certainty can be found in the Fairfield Funds' contractual obligation to invest at least 95% of the money they received in U.S.-based BLMIS.  *See* Margolin Decl.*,* Exs. 6–7, ECF No. 158 (private placement memoranda of Sentry and Sigma).  The relevant contacts were not driven by the conduct of the Fairfield Funds alone; they were the result of Defendant's efforts to invest in BLMIS in New York.

Defendant next argues that the Liquidators' evidence of Defendant's contacts with the United States amount to little more than the stream of commerce theory rejected by *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882–86 (2011), where the Court stated that "it is not enough that [a] defendant might have predicted that its goods will reach the forum," but rather the defendant must "engage[] in conduct purposefully directed at [the forum]." Mem. L. at 14, ECF No. 129. The Liquidators argue that the Defendant did not merely expect that the investments would reach the United States, but rather that Defendant's express purpose of investing in the Fairfield Funds was to invest with BLMIS in New York. Opp'n at 21, ECF No. 211 ("Liquidators argue that UBS Lux chose to invest in the Funds with the specific purpose of having its clients' money invested in U.S.-based BLMIS, and that it did so while knowing that the Funds were obligated under the investment contracts to facilitate that aim, including by directing at least 95% of funds invested to BLMIS."). This conduct was purposefully directed at the forum.

The Court thus finds that Defendant's selection and use of U.S. correspondent accounts and communications with Fairfield Greenwich Group support the Court's exercise of jurisdiction over the claims for receiving redemption payments from the Fairfield Funds with the knowledge that the NAV was wrong. The contacts are not random, isolated, or fortuitous. The contacts demonstrate UBS Lux's purposeful activities aimed at New York in order to effectuate transfers from the Fairfield Funds. The Plaintiffs have thus provided facts that sufficiently support a prima facie showing of jurisdiction over the Defendant.

### C.  <u>Whether the Claim Arises Out of or Relates to the Defendant's Forum Conduct</u>

The suit must "arise out of *or relate to* the defendant's contacts with the forum." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 592 U.S. ----, 141 S. Ct. 1017, 1026, 209 L. Ed. 2d

225 (2021) (emphasis in original).  "[P]roof that a plaintiff's claim came about because of the defendant's in-state conduct" is not required.  *Id.* at 1027.  Instead, a court need only find "an affiliation between the forum and the underlying controversy."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011); *Picard v. BNP Paribas S.A.* (*In re BLMIS*), 594 B.R. 167, 190 (Bankr. S.D.N.Y. 2018) ("Where the defendant's contacts with the jurisdiction that relate to the cause of action are more substantial, however, it is not unreasonable to say that the defendant is subject to personal jurisdiction even though the acts within the state are not the proximate cause of the plaintiff's injury.") (internal quotations omitted).

Defendant argues that the Plaintiffs' claim is not predicated on "whether or not the payments they seek to recover were ever placed with or controlled by BLMIS. Nor does Plaintiffs' claim allege any misconduct in connection with any decision by UBS Lux to place investments with the Funds, or otherwise focus on the decision to invest with the Funds as the basis for either liability or jurisdiction." Mem. L. at 11–12, ECF No. 129.  However, the Liquidators seek imposition of a constructive trust on funds received with knowledge that the NAV was inflated.  Am. Compl. ¶¶ 155–69, ECF No. 110.  The issue of knowledge of the inflated NAV is inextricably tied to the Defendant's investments with New York-based BLMIS. The allegations are directly related to Defendant's investment activities with BLMIS through the Fairfield Funds.  The Defendant's contacts with the United States, in investing in the Fairfield Fund and communicating and meeting with Madoff form a "sufficiently close link" between the defendant, the forum and the litigation concerning Defendant's activities in the forum.  *See MSP Recovery Claims, Series LLC v. Takeda Pharm. Am., Inc.*, 2021 WL 4461773, at *3 (S.D.N.Y. Sept. 29 2021) (quoting *Ford Motor Co.*, 141 S. Ct. at 1032).

**D.  <u>Whether Assertion of Personal Jurisdiction is Reasonable</u>**

If a defendant has sufficient minimum contacts, the Court must then ask "whether the

assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial

justice'—that is, whether it is reasonable under the circumstances of the particular case." *Bank*

*Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002) (quoting

*Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 568 (2d Cir. 1996)); *see also Burger*

*King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985).  Where the plaintiff "makes the threshold

showing of the minimum contacts required for [exercising personal jurisdiction], a defendant

must present a compelling case that the presence of some other considerations would render

jurisdiction unreasonable." *MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3

(quoting *Bank Brussels Lambert*, 305 F.3d at 129).  Factors the Court will consider include the

burden on the defendant; the interests of the forum in adjudicating the case; the plaintiff's

interest in obtaining convenient and effective relief; the interstate judicial system's interest in

obtaining the most efficient resolution of controversies; and the shared interest of the states in

furthering fundamental substantive social policies.  305 F.3d at 129.

The Defendant challenges the reasonableness of this Court's exercise of jurisdiction over

UBS Lux under the circumstances.  Mem. L. at 23, ECF No. 129.  Defendant argues that the

"United States' interest in adjudicating this dispute is minimal at best" because the "dispute is

between foreign parties arising under foreign law pursuant to a foreign contract for the return of

cash sent between two foreign countries in a purely foreign transaction."  Mem. L. at 24–25.

Defendant adds that the claim is "not within the core jurisdiction of the bankruptcy court." *Id.* at

25–26.  (citing *In re Fairfield Sentry Ltd.*, 458 B.R. 665, 685 (S.D.N.Y. 2011) (Preska, J.)).

The Defendant's reliance on *In re Fairfield Sentry Ltd.*, 458 B.R. 665, is misplaced. In that case, the District Court determined whether the proceeding was core or non-core; it did not determine whether adjudication or jurisdiction in the United States was reasonable. *See id.* at 675. Further, the Court has already found that it has subject matter jurisdiction over these proceedings. *See In re Fairfield Sentry Ltd.*, 2018 WL 3756343, at *8 (Bankr. S.D.N.Y. Aug. 6, 2018). Chapter 15 allows for recognition of this proceeding and indicates that the United States has an interest in adjudicating the case.

Defendant argues that it would be subject to "substantial burdens" as discovery "concerning the redemption payments at issue here would potentially expose UBS Lux to civil and criminal liability" in the European Union. Mem. L. at 26, ECF No. 129. In support of this argument, Defendant cites to a ruling in which the Court granted in part and denied in part a motion seeking relief as to the order staying the action and seeking expedited initial disclosures on beneficial holders. *Id.*; *see* Bench Ruling, Adv. Pro. No. 10-03496, ECF No. 799. This Court based that ruling on a comity analysis in light of the then-uncertain "offshore underpinnings for this litigation in its entirety." *Id.* at 2. The Court stated in that ruling that it was "hard-pressed to find any compelling United States' interest in mandating discovery here *at this juncture* of the pending litigation." *Id.* (emphasis added).

The Defendant has not shown that the interests at stake in that proceeding over ten years ago, are the same as those at stake now. UBS Lux only describes a situation that could "potentially expose" it to liability. Mem. L. at 26, ECF No. 129. In 2021, this Court lifted the stay and required the Defendant to proceed to discovery. Order Lifting Stay, ECF No. 108; Scheduling Order, ECF No. 125. The July 2012 Bench Ruling shows that this Court is capable

of alleviating specific burdens identified by a defendant.  The mere potential for exposure to unspecified liability is not a burden which renders exercise of jurisdiction unreasonable.

Defendant argues that the Plaintiffs "have not demonstrated that it is more reasonable for them to litigate their claims against UBS Lux in New York rather than in the BVI, . . . or in Luxembourg, where UBS Lux maintains its relevant offices and personnel and where local courts could address the privacy and bank secrecy interests at issue."  Mem. L. at 26, ECF No. 129.  The Defendant has demonstrated that this Court's exercise of jurisdiction over it may impose a minimal burden in terms of requiring it to "traverse the distance" to the forum.  However, "[e]ven if forcing the defendant to litigate in a forum relatively distant from its home base were found to be a burden, the argument would provide defendant only weak support, if any, because the conveniences of modern communication and transportation ease what would have been a serious burden only a few decades ago."  *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 173 (2d Cir. 2010); *see also In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 273 (2d Cir. 2023).  UBS Lux has participated in this litigation with representation by U.S. Counsel for at least seven years.  *See, e.g.,* Mot. to Dismiss, ECF No. 22.  Defendant has an affiliate or parent entity operating in Connecticut.  Am. Compl. ¶ 19, ECF No. 110, Mem. L. at 7, ECF No. 129.  Furthermore, the United States has a strong interest in ensuring the integrity of its financial systems.

Defendant has alleged that other forums may be able to hear the claims.  What it has not done is demonstrate how this forum would fail to provide effective relief.  *See MSP Recovery Claims, Series LLC*, 2021 WL 4461773, at *3.  Defendant does not explain what interest is impaired by precluding adjudication in another forum or why that interest outweighs other factors in favor of exercising jurisdiction.  *See In re Bernard L. Madoff Inv. Sec. LLC*, No. 22

CIV. 6561 (LGS), 2023 WL 395225, at *6 (S.D.N.Y. Jan. 25, 2023).  The Defendant has not

established that the Court's exercise of personal jurisdiction over it would be unreasonable.  The

Court thus finds that exercising jurisdiction over the Defendant is reasonable and comports with

"traditional notions of fair play and substantial justice . . . ."  *See Int'l Shoe*, 326 U.S. at 316, 66

S.Ct. 154.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Defendant's Motion to Dismiss the

Amended Complaint.  The Liquidators shall submit a proposed order consistent with the findings

in this decision in accordance with Local Bankruptcy Rule 9074-1(a).

**IT IS SO ORDERED.**


Dated:  <u>March 8, 2024</u>
New York, New York

/S/ John P. Mastando III
THE HONORABLE JOHN P. MASTANDO III
UNITED STATES BANKRUPTCY JUDGE